UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

CAROL FLANNIGAN                          CIVIL ACTION


VERSUS                                   NO. 22-3080


UNIVERSAL STEEL AMERICA, INC.            SECTION: "J"(5)
ET AL.


## ORDER AND REASONS

Before the Court are cross-motions for summary judgment filed by Plaintiff, Carol Flannigan, and Defendant, Universal Steel America, Inc. In its *Motion for Summary Judgment*, Defendant moves for summary judgment on all of Plaintiff's claims **(Rec. Doc. 59)**, and Plaintiff moves for partial summary judgment on the following claims: (1) wage discrimination under the Equal Pay Act, (2) retaliation under the Equal Pay Act, (3) unpaid overtime compensation under the Fair Labor Standards Act, and (4) retaliation under both Title VII and the Americans with Disabilities Act **(Rec. Doc. 60)**. Both Plaintiff and Defendant oppose the adverse party's motion for summary judgment. (Rec. Docs. 68, 69).

Having considered the motions and legal memoranda, the record, and the applicable law, the Court finds that Defendant's *Motion for Summary Judgment* should be **GRANTED**, whereas Plaintiff's *Motion for Partial Summary Judgment* should be **DENIED**, for the reasons explained below.

1

## FACTS AND PROCEDURAL BACKGROUND

Plaintiff Carol Flannigan began her employment as an Inside Sales Representative ("ISR") with Defendant, Universal Steel America, Inc. ("USAI"), in June of 2016, after having worked for one of Defendant's competitors in the steel sales industry. In this role, Plaintiff reported to Defendant's Houston office, but she worked remotely from her home in Louisiana. Randy Butler, the president of Universal Steel, offered Plaintiff a starting salary of $65,000 in addition to commissions, which were determined according to a sliding scale and sales goals that applied to all ISRs who reported to the Houston office. Plaintiff worked for Defendant until late May or early June of 2021 when her employment was terminated. Prior to this time, in early October of 2020, Plaintiff had to go on medical leave when she became sick with what she and her physician initially assumed was COVID. However, it was later determined that Plaintiff suffered at least one stroke during this time. She returned to work on December 21, 2020.

According to Defendant, Plaintiff suffered performance issues from the time she started at USAI in 2016. As an ISR, Plaintiff's job consisted of servicing customer accounts, providing price quotes for customized steel orders, and tracking customer orders through the manufacturing and shipping process, among other duties. Defendant alleges that Plaintiff was prone to mistakes in the quoting and ordering process that led to "Non-Conformance Reports" and significant costs to the company. On the other hand, Plaintiff claims that Defendant discriminated against her on the basis of sex by paying her a lower salary than the other ISRs, who were male, thereby

violating the Equal Pay Act. Furthermore, Plaintiff alleges that after she made complaints about this perceived discrimination, Defendant retaliated against her in multiple ways, ultimately terminating her employment. Plaintiff also brings claims against Defendant for violations and retaliation regarding the medical leave she took in late 2020. Defendant has moved for summary judgment on all of Plaintiff's claims, and Plaintiff has moved for partial summary judgment. Each party opposes the other's motion.

## LEGAL STANDARD

Summary judgment is appropriate when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (quoting Fed. R. Civ. P. 56(c)); *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994). When evaluating whether a dispute as to any material fact exists, a court considers "all of the evidence in the record but refrain[s] from making credibility determinations or weighing the evidence." *Delta & Pine Land Co. v. Nationwide Agribusiness Ins. Co.*, 530 F.3d 395, 398 (5th Cir. 2008) (citations omitted). The moving party bears the initial burden of demonstrating that there is no genuine dispute as to any material fact. *Little*, 37 F.3d at 1075.

If the dispositive issue is one on which the nonmoving party will bear the burden of proof at trial, the moving party may satisfy its burden by merely pointing out that the evidence in the record is insufficient with respect to an essential element

of the nonmoving party's claim. *See Celotex*, 477 U.S. at 325. When the moving party meets this burden, the non-moving party "must go beyond the pleadings and designate specific facts showing that there is a genuine issue for trial." *Little*, 37 F.3d at 1075 (citing *Celotex*, 477 U.S. at 325). All reasonable inferences are drawn in favor of the nonmoving party, but a party cannot defeat summary judgment with "conclusory allegations" or "unsubstantiated assertions." *Id.* (citations omitted). A court ultimately must be satisfied that "a reasonable jury could not return a verdict for the nonmoving party." *Delta*, 530 F.3d at 399 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)).

## DISCUSSION

### A. The Equal Pay Act

The Equal Pay Act requires equal pay for equal work, and therefore, it prohibits employers from discriminating against employees by determining their wages on the basis of sex. *See* 29 U.S.C. § 206(d)(1). Here, Plaintiff alleges that Defendant discriminated against her "by paying her lower compensation than it paid to male employees for equal work." (Rec. Doc. 32, at ¶ 121). Courts analyze wage discrimination claims under the Equal Pay Act based on the burden-shifting framework developed in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). To prevail, a plaintiff must first make out a *prima facie* case of wage discrimination by demonstrating that (1) her employer is subject to the Equal Pay Act; (2) she "performed work in a position requiring equal skill, effort, and responsibility under similar working conditions"; and (3) she earned less for this work than an employee

of the opposite sex. *Chance v. Rice Univ.*, 984 F.2d 151, 153 (5th Cir. 1993). To make this showing, a plaintiff must identify a comparator of the other sex who was paid more for substantially similar work under similar working conditions.

Once a plaintiff has established a *prima facie* case, the burden shifts to the defendant to prove that the difference in wages was not based on sex but instead was based on "(1) a seniority system; (2) a merit system; (3) a system which measures earnings by quantity or quality of production; or (4) a differential based on any other factor other than sex." *Siler–Khodr v. Univ. of Tex. Health Sci. Ctr. San Antonio*, 261 F.3d 542, 546 (5th Cir. 2001) (citing the "four affirmative defenses" enumerated in 29 U.S.C. § 206(d)(1)).

In the instant case, Defendant was undoubtedly subject to the Equal Pay Act, so the parties' dispute focuses primarily on the second element. Plaintiff alleges that as an Inside Sales Representative ("ISR"), she performed the same job as the other ISRs who reported to Defendant's Houston office, all of whom were male at the time Plaintiff's employment was terminated. Further, she claims that she was paid less in terms of both her base pay and commissions than these male comparators.

Plaintiff does not argue that Defendant's commission structure violated the Equal Pay Act in that commissions were determined on the basis of sex; instead, she contends that she was discriminated against in terms of the accounts that were assigned to her, which she claims did not allow her to earn commissions equal to those earned by the male ISRs. (Rec. Doc. 60-1, at 8–9). However, Plaintiff does not point to any specific evidence to substantiate this claim beyond conclusory allegations. In

fact, Plaintiff acknowledged in her deposition testimony that the commission structure applied equally to all ISRs, both female and male. (Rec. Doc. 59-10, at 389:5–391:2). Accordingly, Plaintiff has not established a *prima facie* case for wage discrimination as to her commissions, and therefore, the Court will focus only on her claim of wage discrimination regarding her base salary.

According to Plaintiff's summaries of USAI payroll data from 2019 through 2021, she earned a lower base salary than the four male ISRs whom she presents as comparators. (Rec. Doc. 61-2). Defendant does not refute this; however, Defendant argues that because Plaintiff worked from her home in Louisiana, she did not perform her job under "similar working conditions" to those of the ISRs who worked in the Houston office. Therefore, according to Defendant, no proper comparator exists. Specifically, Defendant claims that because Plaintiff worked remotely, she was not exposed to the same industrial "hazards" as the ISRs who worked in the Houston office because they allegedly visited the manufacturing facility "multiple times each day to perform the essential functions of their job—track order progress and resolve issues." (Rec. Doc. 58-1, at 25). Defendant makes much of the fact that when the ISRs entered the manufacturing plant, they had to wear Personal Protective Equipment and expose themselves to hazards such as "heavy machinery and welding fumes," *id.* at 26, whereas Plaintiff, according to Defendant, "worked from the friendly comforts of her home" (Rec. Doc. 68, at 5).

Whether working remotely constitutes dissimilar working conditions when compared to performing the same job in-office is a legal issue of first impression.

6

However, the federal regulation concerning "similar working conditions" provides that "[g]enerally, employees performing jobs requiring equal skill, effort, and responsibility are likely to be performing them under similar working conditions," and "slight or inconsequential differences in working conditions which are not usually taken into consideration by employers . . . in setting wage rates would not justify a differential in pay." 29 C.F.R. § 1620.18. Such a determination requires a "practical judgment," *id.*, and as a practical matter, the Court is not persuaded that the "hazards" that in-office ISRs faced were substantial enough to constitute dissimilar working conditions for purposes of the Equal Pay Act. Furthermore, Plaintiff aptly points out that a consideration of workplace hazards "takes into account the physical hazards *regularly encountered*" by employees. (Rec. Doc. 69, at 10 (citing *Corning Glass Works v. Brennan*, 417 U.S. 188, 202 (1974))). Presumably, if Plaintiff could remotely check the status of orders in the manufacturing plant, so could the in-office ISRs, via email or some other means. It seems doubtful that the in-office ISRs regularly encountered workplace hazards of such a nature that would make their working conditions significantly different from those of Plaintiff.

The Court finds that Plaintiff performed work in a position that required equal skill, effort, and responsibility under similar working conditions as the other ISRs who reported to Defendant's Houston office. Furthermore, Plaintiff has established that she earned a lower base salary than these male comparators. Therefore, Plaintiff has made a *prima facie* case for wage discrimination under the Equal Pay Act.

However, the analysis does not end here, but instead, the burden shifts to Defendant to establish one or more of the four affirmative defenses provided by the statute.

Defendant has established that as president of USAI, Randy Butler made all salary decisions when hiring new Inside Sales Representatives, and Mr. Butler alleges that he based these decisions on a number of factors, most predominantly the individual ISR's experience in the steel sales industry and the book of business that the ISR would bring to USAI. Defendant contends that, assuming the male ISRs who reported to the Houston office are proper comparators, any differences in base salary between Plaintiff and the male comparators can be explained by considerations other than gender, namely "seniority, merit, location, specialty, and book of business." (Rec. Doc. 58-1, at 28).

First, Defendant presents the example of a male employee who began his employment with USAI in 2010 and who later transitioned to remote work; Defendant asserts that he is the only potentially proper comparator because he is the sole ISR of the opposite sex who worked remotely like Plaintiff did. This employee ("Comparator") came to Universal Steel in 2010 with "15 years experience and a large book of business." (Rec. Doc. 59-5, at 1). In fact, in his affidavit, Comparator attested that he "consistently had the largest book of business" at USAI. (Rec. Doc. 59-64, ¶ 17). Comparator negotiated with Mr. Butler to raise his starting salary to $77,000.00. On the other hand, Plaintiff had nine years of experience[1] in the steel

---

[1] In her Opposition to Defendant's Motion for Summary Judgment, Plaintiff claims that she had 15 years of prior industry experience when she joined USAI. The Court accepts this assertion as true, but even if Plaintiff had the same amount of experience as Comparator, Defendant explained that

sales industry as compared to Comparator's fifteen, and she did not bring a book of business with her when she started work at USAI. According to Mr. Butler, because Plaintiff had less experience in steel sales and because she did not have a book of business, in addition to the fact that she wanted to work remotely from Louisiana, he offered her a starting salary of $65,000.00 a year plus commissions. Further bolstering Defendant's argument that salary decisions were based on factors other than gender, Comparator explained that when he requested a permanent transition to remote work after the COVID-19 pandemic, Mr. Butler told him that he would have to take a pay cut and offered him $65,000 as his base salary, which was the same amount that Plaintiff earned. Comparator negotiated to get his salary up to $73,150, but this evidence undermines Plaintiff's claim that decisions about her salary were based on her sex.

On the other hand, Plaintiff argues that "no reasonable juror could conclude that USAI in fact applied a consistent, gender-neutral seniority system to determine base pay." (Rec. Doc. 69, at 12). First, Plaintiff takes issue with the fact that Defendant appears to equate seniority with industry experience, as opposed to years of experience at USAI. *See id.* More importantly, Plaintiff points out that one of the male ISRs, who was hired in 2021, was offered the highest starting salary of all ISRs reporting to the Houston office, male or female, even though Mr. Butler indicated in his deposition that this ISR had only five years of experience. *Id.* (citing Rec. Doc. 69-

---

the salary differential between Plaintiff and Comparator was also based on the "large book of business" that Comparator brought to USAI.

10, at 12:16–18). First, when Mr. Butler testified that this male ISR had only five years' experience, he explicitly acknowledged that he was "guesstimating." (Rec. Doc. 69-10, at 12:16–17). Moreover, Mr. Butler explained that he based this male ISR's base salary on his experience in a targeted market (pressure vessels and cylinders) that Defendant was trying to enter and that this ISR's commissions were capped as compared to the other ISRs due to his higher base salary.

Plaintiff also alleges that Mr. Butler misrepresented the extent of her experience as only nine years and claims that she "began her career in the steel industry at St. Pierre Fabrication in 2001, 15 years prior to joining USAI." (Rec. Doc. 69, at 11). The Court will assume that Plaintiff came to USAI with 15 years of experience rather than nine. Even still, Defendant claims that salary decisions were not made based on years of experience alone, but that instead, Mr. Butler considered multiple factors, including the book of business an individual ISR would bring to USAI. For example, another male comparator who was hired in 2012 and who had a book of business and thirteen years of experience in the steel sales industry received the same starting salary of $65,000.00 per year that Plaintiff did, and according to Mr. Butler, this male ISR was earning only slightly more than Plaintiff ($68,000.00) when Plaintiff's employment was terminated. (Rec. Doc. 59-5, at 1).

Under these facts, Defendant has provided evidence to support an affirmative defense under the Equal Pay Act. Specifically, Defendant has justified its decision to offer Ms. Flannigan a starting salary of $65,000.00, which was lower than the male comparators she identified, based on her years of experience in the steel sales

10

industry, which is a "factor other than sex," and the fact that she did not bring a book of business with her to USAI, which meets the affirmative defense that the pay differential was based on a system of merit. Moreover, Plaintiff has not offered sufficient evidence that would lead to the reasonable inference that Defendant made the decision to offer her a lower salary than male ISRs based on her sex.

Based on the evidence before the Court, a factfinder could not reasonably find in favor of Plaintiff on this claim. Therefore, because there is no genuine dispute as to any material fact, Defendant is entitled to summary judgment on Plaintiff's wage discrimination claim under the Equal Pay Act.

### B. Fair Labor Standards Act ("FLSA"): Overtime and Minimum Wage Claims

Next, Plaintiff makes claims for unpaid overtime and minimum wage violations under the Fair Labor Standards Act, or FLSA. Defendant urges the Court to dismiss Plaintiff's minimum wage claim, and in her Opposition, Plaintiff does not object, nor did she move for summary judgment on this issue. Therefore, the Court will consider only Plaintiff's claim for unpaid overtime compensation under FLSA.

FLSA requires employers to compensate non-exempt employees for any hours worked beyond forty (40) in a single workweek at a rate of at least one and one-half times their regular pay rate. 29 U.S.C. § 207(a)(1). To make a *prima facie* case for unpaid overtime compensation under FLSA, a plaintiff must demonstrate "(1) that there existed an employer-employee relationship . . .; (2) that the employee engaged in activities within the coverage of the FLSA; (3) that the employer violated the

FLSA's overtime wage requirements; and (4) the amount of overtime compensation due." *Johnson v. Heckmann Water Res. (CVR), Inc.*, 758 F.3d 627, 630 (5th Cir. 2014) (citing *Harvill v. Westward Commc'ns, L.L.C.*, 433 F.3d 428, 441 (5th Cir. 2005)).

As is the case here, when the employer has failed to keep "proper and accurate records," the employee simply needs to prove that "he has in fact performed work for which he was improperly compensated" and produce "sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference." *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 687 (1946), *superseded by statute on other grounds*, Portal-to-Portal Act of 1947, Pub. L. No. 104-188, 110 Stat. 1928. Once a plaintiff has made this *prima facie* showing by a preponderance of the evidence, the burden shifts to the defendant to "come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence." *Johnson*, 758 F.3d at 630 (quoting *Harvill*, 433 F.3d at 441).

The instant case is slightly complicated because Defendant incorrectly designated Plaintiff as an "exempt" employee, meaning that she would not have been entitled to overtime pay under FLSA. At this point, however, neither party disputes that as an Inside Sales Representative, Plaintiff was not exempt and hence was entitled to overtime pay for any hours she worked beyond forty (40) in a single workweek. Regarding Plaintiff's *prima facie* case, an employer-employee relationship undoubtedly existed between Plaintiff and Defendant, and it is undisputed that both Plaintiff's and Defendant's activities fell within the FLSA's coverage. Next, because

Plaintiff was misclassified as an exempt employee, it is also clear that if she did in fact work overtime, she was not compensated for this time at the rate of one and one-half times her regular pay.

As the fourth element of her *prima facie* case, Plaintiff must demonstrate the amount of overtime compensation due. In Plaintiff's affidavit, she attests that she "generally worked in excess of 40 hours per week during [her] employment with Defendant." (Rec. Doc. 60-83, at ¶ 9). Plaintiff estimates that she worked an average of 10 hours of overtime per week from the time she began her employment with Defendant in June 2016 through February of 2021, excluding the time she was on medical leave from October 5, 2020 until December 21, 2020. *Id.* Thereafter, from February of 2021 until her employment was terminated, Plaintiff attests that she worked 20–25 hours of overtime per week on average. *Id.* To support these claims of overtime work, Plaintiff has provided work emails that she sent outside of her regular work hours to her supervisor, Sales Manager Phillip Strickhausen, from July to October of 2020. However, as Defendant points out, these emails do not serve as proof that Plaintiff worked more than forty hours in any single workweek but only that she worked outside of regular business hours.

Defendant contends that Plaintiff has failed to make a *prima facie* case for unpaid overtime compensation. Plaintiff, on the other hand, claims that she was misclassified as an exempt employee, a claim that Defendant does not dispute. Accepting that Defendant misclassified Plaintiff as exempt from FLSA's overtime requirement, she would still have to present "sufficient evidence to show the amount

and extent of that work as a matter of just and reasonable inference." *Kirk v. Invesco, Ltd.*, 700 F. App'x 334, 336 (5th Cir. 2017) (quoting *Harvill*, 433 F.3d at 441).

In *Kirk v. Invesco, Ltd.*, the Fifth Circuit addressed a case very similar to the instant suit. There, the plaintiff argued that her employer had misclassified her as an exempt employee under FLSA, and among other claims, she alleged that she had worked overtime but had not been compensated for it. *Id.* at 334. One issue the Fifth Circuit considered on appeal was whether the district court had erred in determining that the plaintiff had not produced sufficient evidence to create a just and reasonable inference that she worked overtime. *Id.* at 336. To support her claims for uncompensated overtime work, Kirk provided her own testimony and "a list showing work emails sent before, during, and after regular work hours, including on weekends," in addition to other pieces of evidence. *Id.* at 337. The district court concluded, and the Fifth Circuit affirmed, that while the emails demonstrated that Kirk worked outside of regular business hours, the evidence was not sufficient to create a just and reasonable inference that she worked more than 40 hours in any given workweek. *Id.*

Similarly to the plaintiff in *Kirk*, Ms. Flannigan has presented essentially two pieces of evidence to support her claims of uncompensated overtime work: her own sworn statement and emails that she sent outside of her regular work hours over a period of months. Based on *Kirk* and other Fifth Circuit case law, the Court concludes that this evidence is insufficient to raise a "just and reasonable inference as to the amount and extent of her work." Neither party has offered evidence to demonstrate

the exact number of hours Plaintiff worked each week, but because Plaintiff bears the burden of proof on this claim, she must provide more than "conclusory allegations" or "unsubstantiated assertions." *Little*, 37 F.3d at 1075. Accordingly, Plaintiff has not made a *prima facie* showing by a preponderance of the evidence that she is entitled to unpaid overtime compensation, and therefore, she has not presented sufficient evidence to create a genuine issue of material fact regarding her claims under FLSA. Therefore, summary judgment in favor of Defendant is warranted.

## C. Retaliation

Plaintiff also claims that Defendant retaliated against her for protected activity under the Equal Pay Act, Title VII, the Americans with Disabilities Act ("ADA"), and FLSA. Specifically, in her First Amended Complaint, Plaintiff alleges that on or about April 7, 2021, she filed complaints with Defendant and notified USAI that she had also filed an inquiry with the Equal Employment Opportunity Commission ("EEOC"). (Rec. Doc. 32, at ¶¶ 139, 145). Thereafter, the EEOC issued a Notice of Right to Sue, and Plaintiff subsequently filed this suit against Defendant. According to Plaintiff, after she notified USAI of her EEOC inquiry, "USAI retaliated against [her] by, in addition to other retaliatory behavior, further isolating her, constantly monitoring and criticizing her work, adding additional workload and new, draconian work conditions, subjecting her to threatening and abusive behavior, subjecting her to harassing emails, and terminating her employment . . . ." (Rec. Doc. 32, at ¶¶ 134, 140, 146, 151).

While Plaintiff alleges retaliation under four separate federal statutes, these claims are all subject to the same analysis under the *McDonnell Douglas* burden-shifting framework. *McDonnell Douglas Corp.*, 411 U.S. at 802–04. Under this framework, "an employee must first establish a prima facie case of retaliation." *Thompson v. Somervell Cnty., Tex.*, 431 Fed. App'x 338, 340 n.1 (5th Cir. 2011). To state a claim for retaliation, a plaintiff must allege that (1) "she engaged in protected activity"; (2) she was subjected to an adverse employment action; and (3) there was a causal connection between the protected activity and the adverse employment action. *Id.* at 341.

Here, Plaintiff clearly alleges that she engaged in protected activity, namely explaining to her supervisor, Mr. Strickhausen, that she felt she was being discriminated against in terms of her pay and later lodging a complaint with the EEOC. Further, she alleges discrimination based on her disability after she went on medical leave, during which she suffered at least one stroke. Plaintiff has also established that she was subsequently subjected to a list of adverse employment actions, the most immediate one being that her employment was terminated in late May/early June of 2021. Finally, Plaintiff must allege a causal relationship between the protected activity and the adverse employment action. Plaintiff received an Employee Disciplinary Notice ("EDN") in March 2021 which she claims was baseless. In her response to the EDN, Plaintiff disputed the content of the notice and alleged discrimination based on sex and disability; further, she notified Defendant that she had already begun the process of filing a complaint with the EEOC. Not long after,

on June 2, 2021, Defendant terminated Plaintiff's employment. While Plaintiff has not provided definitive proof that this protected activity (i.e., complaining about perceived discrimination) was the but-for cause of her termination, "[c]lose timing between an employee's protected activity and an adverse action against [her] may provide the 'causal connection' required to make out a *prima facie* case of retaliation." *Swanson v. Gen. Servs. Admin.*, 110 F.3d 1180, 1188 (5th Cir. 1997) (citing *Armstrong v. City of Dallas*, 997 F.2d 62, 67 (5th Cir. 1993)).

Based on these facts, the Court concludes that Plaintiff has made a *prima facie* showing for retaliation under the Equal Pay Act, Title VII, the ADA, and FLSA, and therefore, the burden shifts to Defendant "to articulate a legitimate, nondiscriminatory or nonretaliatory reason for its employment action." *Newbury v. City of Windcrest, Tex.*, 991 F.3d 672, 678 (5th Cir. 2021). If the defendant does so, "the burden shifts back to the plaintiff to prove that the proffered reason is pretext for the discriminatory or retaliatory purpose." *Id.* A plaintiff must rebut "each nondiscriminatory or nonretaliatory reason articulated by the employer." *Id.*

In this case, Defendant maintains that the decision to terminate Ms. Flannigan had already been set in motion prior to Plaintiff's engaging in protected activity. Specifically, Defendant asserts that Plaintiff suffered from poor performance and mistakes that cost the company money from the very beginning of her employment at USAI. On July 25, 2017, the sales manager at the time, Trevor Stribling, issued a Performance Improvement Plan ("PIP") to address the allegedly excessive mistakes Plaintiff had made that resulted in Non-Conformance Reports and costs to the

17

company. Additionally, Plaintiff received a written warning on the same day she received the PIP. Furthermore, Defendant states, and Plaintiff does not dispute, that Plaintiff received an Employee Disciplinary Notice on February 15, 2019 for "excessive NCR's" in the fourth quarter of 2018 (Rec. Doc. 58-1, at 7), and on August 5, 2020, Plaintiff was issued another EDN for "unsatisfactory job performance" (Rec. Doc. 58-1, at 11). Defendant's list of alleged errors that Plaintiff made on the job continues, but based on the corrective actions listed above, Defendant has clearly met its burden to provide "a legitimate, nondiscriminatory or nonretaliatory reason for its employment action." *Newbury*, 991 F.3d at 678.

Plaintiff claims that the performance-related reasons Defendant offers for terminating her employment are baseless, but she has failed to support her claims with sufficient factual evidence to "prove that the proffered reason is pretext for the discriminatory or retaliatory purpose." *Id.* Because Defendant has more than met its burden in establishing that it terminated Plaintiff's employment based on her performance, summary judgment in Defendant's favor is appropriate on Plaintiff's claims of retaliation.

### D. Emergency Paid Sick Leave Act and the Louisiana Wage Payment Act

Lastly, Plaintiff contends that Defendant failed to pay her (1) the full amount she was entitled to under the Emergency Paid Sick Leave Act ("EPSLA") and (2) wages that she was due under the Louisiana Wage Payment Act ("LWPA").

Plaintiff was on medical leave from October 5 until December 21 of 2020, and she alleges that Defendant paid her for only half of what she was owed under the

EPSLA. During the COVID-19 pandemic, Congress enacted the EPSLA, which was part of the Families First Coronavirus Response Act, both of which expired in December 2020. *See Wilson v. Marshall Shredding, L.L.C.*, No. 22-50709, 2023 WL 3151078, at *2 (5th Cir. Apr. 28, 2023). The Act "required employers to provide up to 80 hours of paid sick leave for employees who established various grounds for entitlement related to COVID-19." *Id.* Plaintiff maintains that she "was paid $1,394.49 *for only 40 hours* under the EPSLA." (Rec. Doc. 69, at 26 (emphasis added)). Plaintiff has offered the following evidence to substantiate her claim: (1) a copy of her earnings statement for the pay period beginning on October 1 and ending on October 15, 2020; (2) her earnings statement covering October 15 through October 31, 2020; and (3) a pay statement for December 16 through December 31, 2020. (Rec. Doc. 60-13). Plaintiff's earnings statement for the pay period ending on October 31, 2020, indicates that Plaintiff was paid $1,394.49, which is the equivalent of 40 hours' worth of pay, under the EPSLA, and according to the December 31 earnings statement, this was the full amount of "COVID Sick Self" pay Plaintiff received for the entire year. *Id.* at 2, 3. Plaintiff did not include an earnings statement for November 2020 because she claims that she did not "receive any pay—under the EPSLA or otherwise—from November 2020 through December 15, 2020." (Rec. Doc. 69, at 20).

On the other hand, Defendant alleges that it paid Plaintiff for the full 80 hours to which she was entitled under the EPSLA, and Melanie Madden, Defendant's Human Resources Manager during Plaintiff's employment, offered an explanation for the discrepancy between Plaintiff's December 31 earnings statement and the amount

Defendant alleges she was actually paid under the EPSLA. Specifically, in her sworn statement, Ms. Madden attested that Defendant switched its payroll processing system from ADP to Ultipro on November 1, 2020. Therefore, according to Ms. Madden, the only way to get a complete picture of USAI's payroll information for the entire year of 2020 is to look at the year-end summary from ADP, which ends on October 31, 2020, in tandem with the end-of-year summary generated by Ultipro, which covers only the months of November and December. Second, Ms. Madden also explained that the ADP payroll processing system that Defendant used prior to November 1, 2020 "did not have an option to designate pay as COVID pay, and therefore, it was designated as PTO in [Defendant's] system." (Rec. Doc. 59-51, at ¶ 47). In other words, Ms. Madden stated that the five days of COVID pay that Plaintiff received in October were coded as PTO, which explains why Plaintiff's end-of-year payroll summary indicated that Plaintiff was paid for only half the time she was entitled to under the EPSLA.

As an attachment to Ms. Madden's affidavit, Defendant presented the ADP year-end summary, dated October 31, 2020, which shows that Plaintiff was paid $1,394.49 (or pay for 40 hours) while she was on leave prior to October 31, 2020. (Rec. Doc. 59-56). This evidence matches Plaintiff's earnings statement from October 31. Next, Defendant provided an exhibit, which, according to Ms. Madden's sworn statement, represents "a true and correct copy of the Ultipro (now UKG) 2020 end of year summary for Ms. Flannigan, which, because [Defendant] switched to Ultipro on November 1, 2020, only covered November and December of 2020." (Rec. Doc. 59-51,

at ¶ 48). Based on Ms. Madden's explanation, this document indicates that Plaintiff was paid the following amounts in November and December 2020: (1) $1,394.49 for COVID pay, which is the equivalent of 40 hours' pay; (2) a total of $730.92 for car allowance and phone reimbursement; and (3) $4,710.32 in regular pay. (Rec. Doc. 59-57).

Therefore, according to Defendant's payroll records, along with Ms. Madden's explanations, Plaintiff earned a total of **$6,835.73** during the months of November and December of 2020. Part of this amount, specifically $2,137.41, was the pay Plaintiff earned when she returned to work from medical leave during the last pay period of December. The difference between these two amounts ($6,835.73 – $2,137.41) is $4,698.32, which represents what Plaintiff was paid while she was on medical leave during the months of November and December. Ms. Madden attested that this amount—$4,698.32—included $1,394.49 for 5 days, or 40 hours, of pay under the EPSLA (in addition to the EPSLA pay Plaintiff earned in October, which was coded as PTO in the ADP system), and a car and phone allowance in the total amount of $730.92 for November and December. The remainder after these amounts are deducted from the total is $2,572.91, and according to Ms. Madden, this figure represents the amount that Plaintiff was paid for 10 PTO days while she was on medical leave in November and the first half of December. However, Ms. Madden further explained that she coded this time as "Regular Pay" rather than as "PTO."

In sum, based on Ms. Madden's sworn statements and the exhibits attached thereto, Defendant paid Plaintiff for the following time under PTO and the EPSLA:

(1) Five days, or 40 hours, of COVID pay, coded as PTO, in the amount of $1,394.49 on October 31, 2020;

(2) Five days, or 40 hours, of COVID pay in the amount of $1,394.49 while Plaintiff was on medical leave during November and December 2020;

(3) Twenty-one days of PTO as of October 31, 2025, as reflected on the ADP register for Ms. Flannigan; and

(4) Ten additional PTO days during November and December, which Ms. Madden claimed she coded as "Regular Pay" "at the Company's discretion because Ms. Flannigan had exhausted her PTO." (Rec. Doc. 59-51, at 10).

Based on these amounts, Defendant paid Plaintiff for 10 days, or 80 hours, under the EPSLA (COVID pay), and for 26 days of PTO during 2020, for a total of 36 days of pay during 2020. Further, Ms. Madden explained that according to company policy, Ms. Flannigan was entitled to only 20 days of PTO for the year but that Defendant paid her for 6 additional days in part "to avoid any issues with Ms. Flannigan and her attorney." *Id.* at 8.

Plaintiff also brought a claim against Defendant under the Louisiana Wage Payment Act. This Act provides that an employer must pay an employee the full amount that is owed "under the terms of employment . . . on or before the next regular payday or no later than fifteen days following the date of discharge, whichever occurs first." La. Stat. Ann. § 23:631. An employer who fails to do so may be held liable for damages. La. Stat. Ann. § 23:632. Because the Court has concluded that Defendant paid Plaintiff for the total amount to which she was entitled under the EPSLA and

for all of the PTO allowed by Defendant's company policy, Plaintiff's claim under the LWPA must also fail. For these reasons, Defendant is entitled to summary judgment on Plaintiff's claims under the EPSLA and the LWPA.

<u>**CONCLUSION**</u>

Accordingly,

**IT IS HEREBY ORDERED** that Defendant Universal Steel America, Inc.'s *Motion for Summary Judgment* **(Rec. Doc. 59)** is **GRANTED** as to all of Plaintiff's claims.

**IT IS FURTHER ORDERED** that Plaintiff's *Motion for Partial Summary Judgment* (Rec. Doc. 60) is **DENIED**.

New Orleans, Louisiana, this 6th day of January, 2026.

CARL J. BARBIER
UNITED STATES DISTRICT JUDGE